## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE SUBPOENA ISSUED IN: | Misc. No. <u>1:25-mc-00126</u> |
| *Giuseppe Pampena, individually and on behalf of all others similarly situated, v. Elon R. Musk*, pending in the United States District for the Northern District of California, Case No. 3:22-cv-05937-CRB | **ORAL ARGUMENT REQUESTED** |
| WALTER ISAACSON, | |
|       Petitioner, | |
|   v. | |
| GIUSEPPE PAMPENA, individually and on behalf of all others similarly situated, | |
|       Respondents. | |

## MEMORANDUM OF LAW OF PETITIONER WALTER ISAACSON IN SUPPORT OF <u>MOTION TO QUASH NON-PARTY SUBPOENA</u>

Elizabeth A. McNamara
Lindsey B. Cherner
DAVIS WRIGHT TREMAINE LLP
1251 Avenue of the Americas, 21st Floor
New York, New York 10020
Telephone: (212) 603-6437
lizmcnamara@dwt.com
lindseycherner@dwt.com

*Attorneys for Petitioner Walter Isaacson*

## <u>TABLE OF CONTENTS</u>

**Page**

INTRODUCTION ......................................................................................................................... 1

FACTUAL AND PROCEDURAL BACKGROUND ................................................................ 3

    A.    Non-Party Walter Isaacson's Book ........................................................................ 3

    B.    The Underlying Litigation ...................................................................................... 4

    C.    The Subpoena............................................................................................................ 6

ARGUMENT ............................................................................................................................... 8

I.    This Court Should Quash The Subpoena Because The Testimony Sought is Protected From Disclosure by The Reporter's Privilege ................................................................. 8

    A.    Plaintiffs Cannot Satisfy the High Burden of Overcoming the Reporter's Privilege for Confidential Newsgathering Materials............................................................ 10

            1.    Plaintiffs Cannot Make a Clear and Specific Showing that Mr. Isaacson's Testimony is Highly Material or Relevant.................................................11

            2.    The Testimony Sought Is Not Necessary or Critical to the Maintenance of Plaintiffs' Claims Against Mr. Musk........................................................ 13

            3.    The Information Sought is Obtainable from Other Sources. ................... 16

    B.    To the Extent the Subpoena Calls for Testimony about Non-Confidential Newsgathering Materials, the Plaintiffs Still Cannot Satisfy their Burden of Overcoming the Reporter's Privilege. ................................................................. 18

            1.    The Testimony Sought is Not of Likely Relevance to a Significant Issue in the Case.................................................................................................... 19

            2.    Plaintiffs Cannot Establish that the Information Sought is Not Reasonably Obtainable from Other Available Sources............................. 20

# TABLE OF AUTHORITIES

Page(s)

**Federal Cases**

*Alcon Vision, LLC v. Allied Vision Grp., Inc.*,
No. 19-MC-384 (AT), 2019 WL 4242040 (S.D.N.Y. Sept. 6, 2019) .....................................13

*Appl. of Behar*,
779 F. Supp. 273, 275 (S.D.N.Y. 1991) .....................................................................13, 14, 16

*Appl. of Consumers Union of U.S., Inc.*,
495 F. Supp. 582 (S.D.N.Y. 1980) .......................................................................................18

*Baker v. F&F Inv.*,
470 F.2d 778 (2d Cir. 1972) ...................................................................................10, 13, 15

*Baker v. Goldman Sachs & Co.*,
669 F.3d 105 (2d Cir. 2012) ..................................................................................................13

*Beach v. Shanley*,
62 N.Y.2d 241 (1984) ............................................................................................................8

*Blum v. Schlegel*,
150 F.R.D. 42 (W.D.N.Y. 1993) .............................................................................................9

*Breaking Media, Inc. v. Jowers*,
No. 21 Misc. 194 (KPF), 2021 WL 1299108 (S.D.N.Y. Apr. 7, 2021) ...................................19

*Dura Pharms., Inc. v. Broudo*,
544 U.S. 336 (2005) .............................................................................................................14

*Giuffre v. Maxwell*,
221 F. Supp. 3d 472 (S.D.N.Y. 2016) .................................................................2, 16, 18, 19

*Giuseppe Pampena v. Elon Musk*,
No. 3:22-cv-05937-CRB (Pending N.D. Cal.) .........................................................................1

*Gonzales v. Nat'l Broad. Co., Inc.*,
194 F.3d 29 (2d Cir. 1999) ..............................................................................9, 10, 19, 20

*Hughes v. Twenty-First Century Fox, Inc.*,
327 F.R.D. 55 (S.D.N.Y. 2018) ............................................................................................12

*In re Appl. to Quash Subpoena to Nat'l Broad. Co., Inc.*,
79 F.3d 346 (2d Cir. 1996) ...............................................................................13, 14, 16, 17

*In re McCray, Richardson, Santana, Wise, & Salaam Litig.*,
    928 F. Supp. 2d 748 (S.D.N.Y. 2013), *aff'd*, 991 F. Supp. 2d 464 (S.D.N.Y. 2013)
    ......................................................................................................17, 19, 20, 21

*In re Pan Am Corp.*,
    161 B.R. 577 (S.D.N.Y. 1993).............................................................13

*In re Petroleum Prod. Antitrust Litig.*,
    680 F.2d 5 (2d Cir. 1982)........................................................10, 11, 18

*Lebowitz v. City of N.Y.*,
    948 F. Supp. 2d 392 (S.D.N.Y. 2013).......................................................21

*Lloyd v. CVB Fin. Corp.*,
    811 F.3d 1200 (9th Cir. 2016) ................................................................16

*Lonegan v. Hasty*,
    No. CV-04-2743 (NG)(VVP), 2008 WL 41445 (E.D.N.Y. Jan. 1, 2008) ..............................10

*Marshall Project, Inc. v. City of Cleveland*,
    No. 24-MC-309 (VEC), 2024 WL 4589667 (S.D.N.Y. Oct. 28, 2024)...................................17

*New England Teamsters & Trucking Indus. Pension Fund v. New York Times Co.*,
    No. 1:14-mc-59, 2014 WL 1567297 (S.D.N.Y. Apr. 17, 2014) ........................................20, 21

*Persky v. Yeshiva Univ.*,
    No. 1:01-cv-5278 (LMM), 2002 WL 31769704 (S.D.N.Y. Dec. 10, 2002)..........11, 13, 16, 17

*Pugh v. Avis Rent A Car Sys., Inc.*,
    No. M8-85, 1997 WL 669876 (S.D.N.Y. Oct. 28, 1997) ...........................................11, 12, 18

*Schoolcraft v. City of N.Y.*,
    No. 1:10-cv-6005 (RWS), 2014 WL 1621480 (S.D.N.Y. Apr. 22, 2014)........................14, 20

*SEC v. Platforms Wireless Int'l Corp.*,
    617 F.3d 1072 (9th Cir. 2010) .............................................................15

*Sikelianos v. City of N.Y.*,
    No. 05-cv-7673 (RJS)(JCF), 2008 WL 2465120 (S.D.N.Y. June 18, 2008).........................20

*United Sates v. Treacy*,
    639 F.3d 32 (2d Cir. 2011)..................................................................21

*United States ex rel. Vuitton Et Fils, S.A. v. Karen Bags, Inc.*,
    600 F. Supp. 667 (S.D.N.Y. 1985) ........................................................11

*United States v. Marcos*,
    No. 87 CR 598 (JFK), 1990 WL 74521 (S.D.N.Y. June 1, 1990)..............................13, 16, 21

*United States v. Shah*,
No. 1:19-cr-833 (SHS), 2022 WL 1422252 (S.D.N.Y. May 5, 2022)..............................19, 20

*von Bulow by Auersperg v. von Bulow*,
811 F.2d 136 (2d Cir. 1987).....................................................................................................9

*Zucco Partners, LLC v. Digimarc Corp.*,
552 F.3d 981 (9th Cir. 2009) ...........................................................................................12, 16

**State Cases**

*Holmes v. Winter*,
22 N.Y.3d 300 (2013) ......................................................................................................9, 11

*Immuno AG. v. Moor-Jankowski*,
77 N.Y.2d 235 (1991) .............................................................................................................8

*O'Neill v. Oakgrove Constr., Inc.*,
71 N.Y.2d 521 (1988) .............................................................................................................8

*Twitter, Inc. v. Elon R. Musk, et al.*,
C.A. No. 2022- 0613-KSJM ...........................................................................................5, 6, 14

**Federal Statutes**

15 U.S.C. § 78a (Securities Exchange Act) ............................................................................1, 9

**Rules**

Federal Rule of Civil Procedure 45 ..........................................................................................8

Federal Rule of Civil Procedure 45(d)(3) .................................................................................1

Federal Rule of Civil Procedure 45(d)(3)(A)(iii).....................................................................8

Pursuant to Federal Rule of Civil Procedure 45(d)(3), Petitioner Walter Isaacson ("Petitioner" or "Mr. Isaacson"), by and through undersigned counsel, respectfully submits this Memorandum of Law in Support of his Motion to Quash the Non-Party Subpoena commanding deposition testimony in New York ("Subpoena"). Mr. Isaacson is a journalist and book author who wrote a biography of Elon Musk. The Subpoena was issued for compliance in New York by Respondents as counsel for Lead Plaintiffs Steve Garrett, Nancy Price, John Garrett, and Brian Belgrave ("Plaintiffs"), in a securities class action, *Giuseppe Pampena v. Elon Musk*, No. 3:22-cv-05937-CRB, pending in the United States District Court for the Northern District of California (the "Action"). This District is the proper venue for this Motion.[1]

## <u>INTRODUCTION</u>

This Subpoena represents an impermissible intrusion upon Mr. Isaacson's constitutionally-protected right to safeguard his journalistic newsgathering processes, work product, and confidential sources. Mr. Issacson is a preeminent journalist and biographer. As is relevant here, he is the author of the 2023 biography *Elon Musk*, which traces Elon Musk's life from early childhood through the present (the "Book"). Except as expressly identified in the Book, Mr. Isaacson's sources, work product and investigations relevant to the Book are confidential.

The Subpoena arises out of a securities class action filed in the Northen District of California by Plaintiffs against Mr. Musk. The First Amended Complaint (the "FAC") alleges *inter alia* that Mr. Musk violated the Securities Exchange Act by making multiple public misstatements concerning the prevalence of bot accounts on the Twitter platform in the lead-up to his acquisition

---

[1] Motions to quash a third-party subpoena must be brought in "the court for the district *where compliance is required*." Fed. R. Civ. P. 45(d)(3) (emphasis added). The Subpoena at issue was accepted by counsel for Mr. Isaacson and identifies a New York place of compliance. Declaration of Elizabeth A. McNamara ("McNamara Decl.") ¶ 2, Ex. A. Because the Subpoena commands testimony in New York, and because Mr. Isaacson regularly transacts business and has a home in New York City, compliance is proper in this District.

of Twitter.  Plaintiffs further allege that these statements artificially depressed the price of Twitter stock in order to pressure Twitter to lower the acquisition price.  Only a small fraction of Mr. Isaacson's Book concerns Mr. Musk's acquisition of Twitter.

After over two years of litigation, Plaintiffs now seek to command Mr. Isaacson's testimony and they do so even before they have deposed Mr. Musk, the defendant, and only after Plaintiffs waived their rights to depose other highly relevant, non-confidential sources actually identified in the Book.  In other words, Plaintiffs seek Mr. Isaacson's testimony to fill the evidentiary gaps created by their own actions.  This is impermissible and does not begin to meet the stringent requirements of the Second Circuit's federal reporter's privilege.  When, as here, the requested testimony involves a reporter's confidential sources, Plaintiffs must show that Mr. Isaacson's testimony is critical or necessary to their claims.  And whether his unpublished information concerns confidential or non-confidential sources, Plaintiffs must exhaust all alternative sources.  Plaintiffs do not begin to meet their burden.

Mr. Isaacson's testimony is fully protected by this Court's application of the reporter's privilege, a privilege that is meant to cover this exact situation:  to shield journalists from unwarranted fishing expeditions regarding their newsgathering sources and entanglements in litigation solely by virtue of the subjects they cover.  Plaintiffs cannot force Mr. Isaacson to testify about his reporting—particularly, his confidential sources—on the off chance that he may have relevant information to their legal claims.  *Giuffre v. Maxwell*, 221 F. Supp. 3d 472, 480 (S.D.N.Y. 2016).  Nor can Plaintiffs force such testimony when, as here, they have (or should have had) multiple means of obtaining firsthand information from alternative sources other than Mr. Isaacson.  Mr. Isaacson respectfully requests that the Court quash the Subpoena.

## FACTUAL AND PROCEDURAL BACKGROUND

### A.    Non-Party Walter Isaacson's Book

Mr. Isaacson is an award-winning professional journalist and bestselling author who has worked as a biographer for decades, publishing books on some of the most consequential public figures:  Henry Kissinger, Benjamin Franklin, Leonardo da Vinci, Albert Einstein, Steve Jobs, Jennifer Doudna, and Elon Musk.   Declaration of Walter Isaacson ("Isaacson Decl.") ¶ 2. His Musk biography was shortlisted for the Financial Times and Schroders Business Book of the Year.  *Id.* ¶ 5.  Mr. Isaacson is also a professor of history at Tulane University, a cohost of the PBS show Amanpour & Co., a contributor to CNBC, and host of the podcast "Trailblazers, from Dell Technologies."  *Id.* ¶ 2.  In his storied career, he was the editor of Time, the CEO and Chairman of CNN, and the CEO of the Aspen Institute.  *Id.*  The access and trust that is central to Mr. Isaacson's reporting often comes with a commitment of confidentiality.  *Id.* ¶ 3.  As he explains in his accompanying Declaration, his ability to honor such promises of anonymity is fundamental to his work as a reporter and author.  *Id.*

In reporting for the Book, Mr. Isaacson shadowed Mr. Musk on a near daily basis, attending his meetings, listening to conversations in private corridors, walking his factories with him, and spending hours interviewing him, his family, friends, coworkers, adversaries, and ex-wives. *Id.* ¶ 5; McNamara Decl. Ex. B at 619.  The Book traces Mr. Musk's life from childhood in South Africa in the 1970s, his evolving relationships with his family and friends, his vision for electric vehicles at Tesla, space exploration with SpaceX, and the takeover of Twitter and its conversion to X.  *Id.* ¶ 5.  Thus, the vast majority of the Book is entirely irrelevant to the underlying litigation.

The Twitter acquisition is discussed in a few pages of the Book, primarily in Chapter 78. *Id.* ¶ 6.  Plaintiffs have focused on one particular passage where the Book reports that Mr. Musk requested, and Twitter provided, raw data concerning "how many real users it had" though

"[Mr. Musk's] team deemed [the data] almost unusable," and as a result, "Musk used this as a pretext to withdraw from the deal." *Id.* ¶ 6; McNamara Decl. ¶ 2, Ex. B at 490. The passage includes a quote from a letter Mr. Musk's lawyers sent which stated that Mr. Musk had been seeking data in order to make "an independent assessment of the prevalence of fake or spam accounts" and given Twitter's resistance, Mr. Musk was "exercising his 'right to terminate the Merger Agreement.'" *Id.* ¶ 6. The Book's notes for this chapter identify (in relevant part) Mr. Musk, Jared Birchall (a Musk advisor) and Alex Spiro (a partner at Quinn Emmanuel) as sources. *Id.* ¶ 6; McNamara Decl. Ex. B at 634. Beyond those identified sources, Mr. Isaacson's reporting concerning the Twitter acquisition was based on confidential sources and information. Isaacson Decl. ¶ 4.

### B.    The Underlying Litigation

Plaintiffs' Action was filed on October 10, 2022, in the Northern District of California. On June 8, 2023, the Plaintiffs filed their First Amended Complaint ("FAC") for violations of the federal securities laws, alleging that Mr. Musk made six false statements between May 13, 2022 and October 4, 2022 (the "Class Period") which were "carefully calculated to drive down the price of Twitter stock." McNamara Decl. Ex. E ¶ 1. The Action has been pending for more than two years.

As relevant here, the Action alleges that on April 25, 2022, Twitter entered into a merger agreement to be acquired by an entity wholly-owned by Mr. Musk for $54.20 per share, resulting in a total transaction value of approximately $44 billion. *Id.* ¶ 85. Shortly thereafter, Plaintiffs alleged that "the stock market declined and Tesla stock, which Musk had pledged as collateral, began to decline." McNamara Decl. Ex. G at 1. Accordingly, Plaintiffs argue that Mr. Musk proceeded to post misleading Tweets and make false public statements to "create unfounded

uncertainty and drive Twitter's stock down." *Id.* After two months of alleged public misstatements, on June 12, 2022, Twitter sued Mr. Musk in Delaware Chancery Court for specific performance. McNamara Decl. Ex. E ¶ 143; *Twitter, Inc. v. Elon R. Musk, et al.*, C.A. No. 2022-0613-KSJM (the "Delaware Action"). The Delaware Action ended shortly after October 4, 2022, when Mr. Musk announced that he intended to go through with the acquisition at the initial price of $54.20. *Id.* ¶ 151. According to Plaintiffs' Opposition, in an April 12, 2023, interview with the BBC, Mr. Musk "admitted that he made false statements about the Merger to drive Twitter's stock down because he did not want to pay the price he had agreed to." McNamara Decl. Ex. G at 3.

While the FAC originally asserted six materially false statements, only three statements survived Mr. Musk's motion to dismiss: two Tweets from May 13 and May 17, 2022, respectively, and a May 16, 2022, statement Mr. Musk made at a technology conference. McNamara Decl. Ex. I at 1, 39. Those statements relate to the prevalence of spam accounts on Twitter's platform and Mr. Musk's claim that the acquisition was on hold:

- On May 13, 2022, Mr. Musk tweeted: "Twitter deal temporarily on hold pending details supporting calculation that spam/fake accounts do indeed represent less than 5% of users." McNamara Decl. Ex. J at 3.

- On May 16, 2022, Mr. Musk stated publicly during the All In Summit, a technology conference in Miami, that "fake and spam accounts make up at least 20% of Twitter's users." *Id*.

- On May 17, 2022 Mr. Musk tweeted that the actual number of fake accounts at Twitter could be "much higher" than 20% and that the deal "cannot move forward." *Id*.

(together, the "Statements"). And to establish their claim, the Plaintiffs have to show that the public Statements were materially misleading, made with scienter, and caused investors to suffer losses from May 13, 2022 to October 4, 2022 (the "Class Period"). McNamara Decl. Ex. I at 1, 17. Any discovery sought must be relevant to those Statements, the elements for a securities claim, and restricted in time by the Class Period.

Since December 11, 2023, the parties have been actively litigating the Action. Through a review of the hundreds of pages filed on the docket, none of the filings, including the parties' recent discovery dispute letters, claim that Mr. Isaacson's testimony or his Book is in any way critical or even highly relevant to the success of the Plaintiffs' securities claim. *See e.g.*, McNamara Decl. Ex. M-S. Indeed, none of Plaintiffs' legal arguments appear to in any way turn on the Book or what it reports. To the contrary, the record reveals that the discovery taken in the Delaware Action satisfies the majority of their discovery needs. Plaintiffs stipulated, in pertinent part, that because many of the same parties to the Action also produced documents and testified in the Delaware Action, they would not seek any additional document discovery or testimony from any party or third-party to the Delaware Action, including Twitter, X Corp., Tesla, Jared Birchall, and Quinn Emmanuel among others. McNamara Decl. Ex. K at 10 (Ex. 1, ¶ C). In other words, Plaintiffs have expressly waived their right to take additional discovery from the same individuals and entities named in the Book with firsthand knowledge concerning the information at issue.[2]

The parties also reached an agreement that Mr. Musk's deposition will occur on April 3, 2025, *after* Mr. Isaacson's noticed non-party deposition. McNamara Decl. Ex. O. Per the Court's Order, dispositive motions are not due until August 22, 2025, and no trial date has been set. McNamara Decl. Ex. L at 3. In sum, Plaintiffs have plenty of time to acquire the testimony they seek from firsthand sources (like Mr. Musk).

### C.    The Subpoena

On February 14, 2025, counsel for Mr. Isaacson accepted service of the Subpoena at issue. McNamara Decl. Ex. A. The Subpoena commands Mr. Isaacson to appear for an in-person

---

[2] Notwithstanding this apparent waiver, Plaintiffs recently filed a discovery letter on March 20, 2025, in which they claim Mr. Spiro is the second-most important witness in the Action and are now trying to serve him with a deposition subpoena. McNamara Decl. Ex. R. Similar to what is happening with the Subpoena at issue here, Mr. Spiro argues that Plaintiffs' attempt to depose him is a last ditch effort to fill their evidentiary gaps. McNamara Decl. Ex. S.

deposition in New York on March 28, 2025, at 9:30 a.m. but did not include a list of topics of the testimony sought.  *Id.*

In discussions concerning the possible relevance of Mr. Isaacson's testimony, Plaintiffs' counsel conceded that they had only taken one deposition in the underlying Action and had not deposed Mr. Musk.  McNamara Decl. ¶ 4.  Mr. Isaacson's counsel requested that Plaintiffs identify specific passages and page numbers of the Book that they claim are relevant to the Action.  *Id.* In response, on February 18, 2025, Plaintiffs' counsel said that "most passages of Chapter 78" of the Book are "highly relevant," specifically one passage:  "When Musk demanded the raw data and methodology for determining how many real users it had, Twitter provided floods of data in formats his team deemed almost unusable.  Musk used this as a pretext for trying to withdraw from the deal."  *Id.* ¶ 5; Ex. B at 489.  Mr. Isaacson's counsel explained that it is evident from the Book that this passage involves multiple other sources—Twitter employees, Mr. Musk's team, and Mr. Musk—as well as contemporaneous documents.  McNamara Decl. ¶ 5.

On February 26, 2025, Mr. Isaacson's counsel again met and conferred with Plaintiffs' counsel.  McNamara Decl. ¶ 6.  Plaintiffs' counsel explained that they sought Mr. Isaacson's testimony for multiple reasons.  *First*, to track Mr. Musk through the critical time period, identifying that period as January-November 2022, notwithstanding that range exceeds the defined Class Period in the FAC.  *Id.*; Ex. E ¶ 1.  *Second*, to probe Mr. Isaacson's knowledge and observations concerning Mr. Musk's statements about the Twitter bots.  McNamara Decl. ¶ 6. *Third*, to explore their belief that Mr. Musk was allegedly losing money from Tesla, which according to the FAC, is relevant to support their claim that he had "the motive and opportunity to commit fraud" because the "large decline in Tesla stock post-signing put him in a bind."  *Id.*; Ex. E

at ¶ 153.  *Fourth*, to explore Mr. Isaacson's knowledge of Mr. Musk's efforts to deprive Twitter executives of their severance, claiming that he was motivated by personal vendettas.  *Id.* ¶ 6.

In an effort to avoid this motion, Mr. Isaacson's counsel offered to provide a declaration from Mr. Isaacson confirming the accuracy of the published information in his Book (since published information is not privileged).  Plaintiffs' counsel rejected that offer unless Mr. Isaacson would agree to waive the 100 mile rule and agree to appear as a trial witness at any trial.  Failing to reach any agreement, this motion to quash follows.  Mr. Musk does not oppose this motion.[3]

## ARGUMENT

Federal Rule of Civil Procedure 45(d)(3)(A)(iii) provides that, "[o]n timely motion, the court for the district where compliance is required must quash or modify a subpoena that: . . . requires *disclosure of privileged or other protected matter*, if no exception or waiver applies[.]" (emphasis added).  The Subpoena should be quashed under Rule 45 because the testimony the Subpoena seeks constitutes confidential newsgathering information that is protected from disclosure by the qualified reporter's privilege established under the law of this Circuit.

## I.    THIS COURT SHOULD QUASH THE SUBPOENA BECAUSE THE TESTIMONY SOUGHT IS PROTECTED FROM DISCLOSURE BY THE REPORTER'S PRIVILEGE

New York has long provided "one of the most hospitable climates for the free exchange of ideas."  *Beach v. Shanley*, 62 N.Y.2d 241, 255 (1984) (Wachtler, J., concurring); *see also Immuno AG. v. Moor-Jankowski*, 77 N.Y.2d 235, 249 (1991); *O'Neill v. Oakgrove Constr., Inc.*, 71 N.Y.2d 521, 529 & n.3 (1988) (the history of freedom of speech in New York "call[s] for particular

---

[3] Mr. Musk's counsel sent a letter confirming that he "agrees that Plaintiffs' efforts to depose and seek testimony from Mr. Isaacson will necessarily implicate or call for information protected by the relevant privilege and/or shield laws." McNamara Decl. Ex. D.  The letter also enclosed a document subpoena that would only go into effect should this Court deny this motion to quash.  *Id.*  The subpoena seeks highly confidential newsgathering materials and underscores the breadth of intrusion this inquiry would set in motion.  Mr. Isaacson reserves his right to move to quash this additional subpoena into Mr. Isaacson's confidential newsgathering materials.

vigilance by the courts of this State in safeguarding the free press against undue interference."). Reflecting this tradition, under the Second Circuit's applicable precedents, the reporter's privilege protects reporters from the compelled disclosure of confidential newsgathering materials and information as well as non-confidential, unpublished newsgathering materials and information.

The federal reporter's privilege applies here because the claims in the underlying Action are governed by federal statute—the Securities Exchange Act. *See von Bulow by Auersperg v. von Bulow*, 811 F.2d 136, 141 (2d Cir. 1987) ("federal law of [reporter's] privilege controls" in a federal question case). However, "[i]n examining the boundaries of the journalist's privilege" under federal law, the Second Circuit has instructed courts to "consider also the applicable state law, in this case New York's so-called 'Shield Law,'" and advised that courts should not "ignore New York's policy of giving protection to professional journalists." *Id.* at 144 (internal citation omitted); *see also Blum v. Schlegel*, 150 F.R.D. 42, 44 (W.D.N.Y. 1993) (observing that "the underlying policies of the state Shield Law are congruent with the federal courts' recognition of a journalist's privilege"). As the New York Court of Appeals has observed, "New York public policy as embodied in the Constitution and our current statutory scheme provides a mantle of protection for those who gather and report the news—*and their confidential sources*—that has been recognized as *the strongest in the nation*." *Holmes v. Winter*, 22 N.Y.3d 300, 310 (2013) (emphasis added).

The Second Circuit "has long recognized the existence of a qualified privilege for journalistic information" under federal common law. *Gonzales v. Nat'l Broad. Co., Inc.*, 194 F.3d 29, 32 (2d Cir. 1999). This privilege reflects the "'paramount public interest in the maintenance of a vigorous, aggressive and independent press capable of participating in robust, unfettered debate over controversial matters, an interest which has always been a principal concern of the

First Amendment.'" *Baker v. F&F Inv.*, 470 F.2d 778, 782 (2d Cir. 1972). The Second Circuit has set forth a two-tiered test for overcoming the federal reporter's privilege—one applying to confidential sources and the other to unpublished newsgathering information. *Gonzales*, 194 F.3d at 32. Plaintiffs cannot satisfy either test. Accordingly, this Court should quash the Subpoena.

### A.     Plaintiffs Cannot Satisfy the High Burden of Overcoming the Reporter's Privilege for Confidential Newsgathering Materials

Because this Circuit has long recognized that confidentiality is "essential to fulfillment of the pivotal function of reporters to collect information for public dissemination," *In re Petroleum Prod. Antitrust Litig.*, 680 F.2d 5, 8 (2d Cir. 1982) (per curiam), it has established a demanding qualified privilege that protects reporters from being compelled to reveal their confidential sources and information. *See Baker*, 470 F.2d at 782 ("Compelled disclosure of confidential sources unquestionably threatens a journalist's ability to secure information that is made available to him only on a confidential basis."); *Lonegan v. Hasty*, No. CV-04-2743 (NG)(VVP), 2008 WL 41445, at *2 (E.D.N.Y. Jan. 1, 2008) ("The damage caused by the required revelation of confidential information is obvious: if sources fear that their identities will be readily subject to exposure, they will be less likely to provide information to journalists and the press's ability to perform its constitutionally protected function will be compromised.").

In reporting for the Book, including those portions related to Mr. Musk's acquisition of Twitter, Mr. Issacson relied on certain confidential sources. Isaacson Decl. ¶ 4. As detailed *supra*, Mr. Isaacson had an arrangement in which he could listen in and have knowledge of private, confidential conversations but had to keep confidential the names and sources of the information relayed. *Id.* By this Subpoena, Plaintiffs target information which garners the highest degree of protection under the applicable federal case law: Mr. Isaacson's confidential source(s) allegedly relevant to the prevalence of bots on the Twitter platform and the bases for Mr. Musk putting the

acquisition on hold.  *Id.*; *see also Holmes*, 22 N.Y.3d at 310 (noting that "safeguarding the anonymity of those who provide information in confidence is perhaps the core principle of New York's journalistic privilege").

Because Plaintiffs seek confidential newsgathering information, "disclosure may be ordered only upon a clear and specific showing that the information is: [1] highly material and relevant, [2] necessary or critical to the maintenance of the claim, and [3] not obtainable from other available sources." *In re Petroleum Prod. Antitrust Litig.*, 680 F.2d at 7.  If a party fails to satisfy any one of these factors, it does not overcome the privilege. *See Persky v. Yeshiva Univ.*, No. 1:01-cv-5278 (LMM), 2002 WL 31769704, at *4 (S.D.N.Y. Dec. 10, 2002) (subpoenaing party did not overcome the privilege where it satisfied the first two factors, but not the third).  For the following reasons, Plaintiffs cannot satisfy any of these three factors.

> **1.    Plaintiffs Cannot Make a Clear and Specific Showing that Mr. Isaacson's Testimony Is Highly Material or Relevant.**

Courts have held that a party cannot make a "clear and specific showing" adequate to satisfy the first factor where the party seeks discovery based merely on "speculation" or a "hunch" that the subpoenaed journalist *may* have material information.  *See Pugh v. Avis Rent A Car Sys., Inc.*, No. M8-85, 1997 WL 669876, at *4 (S.D.N.Y. Oct. 28, 1997) (granting motion to quash upon finding that the "subpoena [wa]s based only upon Defendant's 'hunch' that the *60 Minutes* interview outtakes . . . must contain some information useful to its argument" which amounted to "nothing more than speculation"); *United States ex rel. Vuitton Et Fils, S.A. v. Karen Bags, Inc.*, 600 F. Supp. 667, 671 (S.D.N.Y. 1985) (same).

Here, Plaintiffs' legal claims have never referenced Mr. Isaacson's newsgathering or his Book.  McNamara Decl. Ex. E, G, M-S.  Instead, it appears that Plaintiffs seek Mr. Isaacson's testimony in the hope that it will validate their *hunch* that Mr. Musk did not really have a concern

about the prevalence of bots on Twitter, but instead had a personal vendetta to deprive Twitter executives of their severance, or his stated concerns were all a pretext since he no longer had sufficient funding because of Tesla's reduced stock value. *See e.g.*, McNamara Decl., Ex. G at 1, 11, 17, 24. But these wholly speculative theories (that require Mr. Isaacson to step into Mr. Musk's mind) are ultimately peripheral at best to the key issues in the underlying action because "motive and opportunity" are not necessary to show scienter in a securities fraud action. *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 998 (9th Cir. 2009) (allegations of "motive and opportunity," without more, is "not enough to establish a cogent and compelling inference of scienter") (internal quotation marks and citation omitted). Because Plaintiffs seek *speculative* testimony that is not central to their allegations, either at summary judgment or trial, they engage in nothing more than the type of unfounded fishing expedition that courts repeatedly hold insufficient to satisfy the first factor. *See, e.g.*, *Pugh*, 1997 WL 669876, at *4.[4]

Finally, the only area of testimony Plaintiffs' counsel has identified that bears any arguable relevance to their claims concerns Mr. Isaacson's knowledge and observations regarding Mr. Musk's statements about the percentage of bots on Twitter during the Class Period. McNamara Decl. ¶ 6. Yet, what Mr. Isaacson understood Mr. Musk to believe is irrelevant. Mr. Isaacson's state of mind has no bearing on the outcome of this case; rather it is Mr. Musk's state of mind and that of reasonable investors that Plaintiffs require. Indeed, within the meaning of this Circuit's reporter's privilege, is has been long understood that what a reporter may or may not believe about the actions of a subject of his reporting "is not highly material or relevant, necessary or critical."

---

[4] Further underscoring the lack of relevance of Mr. Isaacson's testimony is the fact that Plaintiffs seek testimony beyond the scope of the FAC, such as Mr. Musk's whereabouts from January 2022 through November 2022, even though that date range *exceeds* the defined Class Period, *i.e.*, May 13, 2022 through October 4, 2022. *Hughes v. Twenty-First Century Fox, Inc.*, 327 F.R.D. 55, 57 (S.D.N.Y. 2018) (considering whether a subpoena imposes an undue burden by looking to multiple factors, including relevance and "the time period covered by it") (internal quotation marks and citation omitted).

*In re Pan Am Corp.*, 161 B.R. 577, 585–86 (S.D.N.Y. 1993) ("[w]hat S&P believed about Delta's intentions—whether contained in S & P's internal documents or not—is not highly material or relevant, necessary or critical to Pan Am's claim" that Delta "fail[ed] to honor its commitment to fund Pan Am's reorganization").  Plaintiffs' counsel cannot demonstrate that the testimony it seeks is "relevant" let alone "highly material."[5]  For this reason alone, Plaintiffs cannot overcome the reporter's privilege and the motion should be quashed.

### 2.    The Testimony Sought Is Not Necessary or Critical to the Maintenance of Plaintiffs' Claims Against Mr. Musk.

Information that is merely useful or potentially beneficial to a party's legal claims does not satisfy the second factor of the test.  *In re Appl. to Quash Subpoena to Nat'l Broad. Co., Inc.*, 79 F.3d 346, 351 (2d Cir. 1996) (finding necessary or critical requires "something more than 'useful'").  Instead, the Second Circuit has underscored that information is "necessary or critical" to a claim only when the claim "'virtually *rises or falls* with the admission or exclusion of the proffered evidence.'"  *Persky*, 2002 WL 31769704, at *3 (quoting *In re Nat'l Broad. Co., Inc.*), 79 F.3d at 351; *see also Baker*, 470 F.2d at 783 (the information must "go to the heart of [the] case").  Critically, information that is "cumulative of other evidence" can never be "necessary or critical" to a claim.  *See, e.g.*, *Appl. of Behar*, 779 F. Supp. 273, 275 (S.D.N.Y. 1991); *United States v. Marcos*, No. 87 CR 598 (JFK), 1990 WL 74521, at *4 (S.D.N.Y. June 1, 1990).

To begin, the Subpoena is premature and unduly burdensome because Plaintiffs have not deposed Mr. Musk who can directly testify to his state of mind.  *Alcon Vision, LLC v. Allied Vision Grp., Inc.*, No. 19-MC-384 (AT), 2019 WL 4242040, at *2 (S.D.N.Y. Sept. 6, 2019) ("To the extent

---

[5] Moreover, any questions about the circumstances of Mr. Isaacson's interviews, his reporting techniques, or even his impressions of Mr. Musk or his published statements would necessarily require Mr. Isaacson to refer to unpublished newsgathering information to testify truthfully and wholly.  *Baker v. Goldman Sachs & Co.*, 669 F.3d 105,110 (2d Cir. 2012) (even a proposed question about accuracy of published statement "cannot be divorced from unpublished material relating to the article").

that [the plaintiff] seeks Defendants' representations to [the non-party], [the plaintiff] can obtain that information from Defendants . . . ."). And once they do depose Mr. Musk, the Subpoena undoubtedly becomes cumulative of any testimony or documents they could possibly seek from him or anyone else with whom he spoke about the prevalence of bots on Twitter in May 2022. *See Behar*, 779 F. Supp. at 275 (information sought not necessary or critical where the party had "18 other pieces of evidence in support of its [] claim"). And even if Mr. Musk ultimately denies any statements made in the Book during his deposition, "impeachment material is not crucial or necessary to the maintenance or defense of a claim." *In re Nat'l Broad. Co.*, 79 F.3d at 352. Plainly, Mr. Isaacson's testimony is not "critical" to Plaintiffs' claims.

Further, as the record in this Action establishes, there were more than 40 depositions in the Delaware Action and presumably thousands of documents. Given this wealth of evidence, it defies logic for Plaintiffs to claim that Mr. Isaacson is somehow an essential witness in their case merely because he published a biography about Mr. Musk, only six pages of which Plaintiffs have specifically identified as relevant. Indeed, this is exactly the sort of "unnecessary enmeshing of the press in litigation that arises from events they cover" from which the reporter's privilege protects. *Schoolcraft v. City of N.Y.*, No. 1:10-cv-6005 (RWS), 2014 WL 1621480, at *2 (S.D.N.Y. Apr. 22, 2014) (citation omitted).

Mr. Isaacson's testimony concerning his confidential sourcing (or his unpublished newsgathering information) concerning Mr. Musk's acquisition of Twitter or his belief in how prevalent bots were on Twitter does not bear on *any* of the contested elements of Plaintiffs' securities claims. Plaintiffs' claim hinges on whether three public Statements made in May 2022 were materially misleading, made with scienter, and whether the alleged misrepresentations caused investors to suffer losses during the defined Class Period. McNamara Decl. Ex. I at 1, 17; *see Dura*

*Pharms., Inc. v. Broudo*, 544 U.S. 336, 341–42 (2005).  None of the elements in dispute "rise or fall" on whether Mr. Isaacson testifies.  *Baker*, 669 F.3d at 108 ("The test is not merely that the material be helpful or probative, but *whether or not . . . the action may be presented without it.*") (emphasis added) (internal quotation marks and citation omitted).

Nor does this conclusion change with Plaintiffs' anticipated argument that Mr. Isaacson can shed light on whether Mr. Musk lied about his belief in the prevalence of the Twitter bots, using this "as pretext to withdraw from the deal."  McNamara Decl. Ex. B at 490.  Information obtained from confidential sources as to others' subjective characterizations of Mr. Musk's statements and actions will not aid them on materiality, scienter, and causal losses.  To the contrary, as is evident from Plaintiffs' arguments in the Action, the critical inquiry is whether"[a] reasonable investor who <u>sold</u> during the months when Musk was claiming the deal was 'on hold' and 'terminated' would have acted differently had they known that," among other things, "Musk had no evidence that the number of spam/fake accounts exceeded 5% . . . and that Musk still intended to go through with the Merger."  McNamara Decl. Ex. G at 4 (emphasis in original).  Mr. Isaacson's testimony is hardly necessary or critical since he can shed no light on what a reasonable investor would have done concerning the sale of Twitter stocks.  Nor can Mr. Isaacson provide a window into Mr. Musk's intentions or state of mind.  Plaintiffs must ultimately show that Musk "knew his [] statements were false, or was consciously reckless as to their truth or falsity."  *SEC v. Platforms Wireless Int'l Corp.*, 617 F.3d 1072, 1093 (9th Cir. 2010).  And as Plaintiffs' conceded in their Opposition, because Mr. Musk "bought Twitter personally . . . [he] was the only person with knowledge about all the facts of the Buyout," indeed, "[t]here was no group here; it was Musk and Musk alone."  McNamara Decl., Ex. G at 13.  Thus, there is no doubt that the primary deponent

with actual knowledge of whether his Statements were false is Mr. Musk.[6]  Finally, as to loss

causation, "the ultimate issue is whether the defendant's misstatement, as opposed to some other

fact, foreseeably caused the plaintiff's loss."  *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1210 (9th

Cir. 2016).  Mr. Isaacson's testimony is not conceivably critical or necessary to establish a causal

relationship between the Statements and the Plaintiffs' losses.  Plaintiffs' claims rest on testimony

from Mr. Musk, Mr. Musk's team, contemporaneous documents (like the letter quoted in the

Book), or any of the other non-confidential sources disclosed in the Book, not Mr. Isaacson.

In sum, no information obtainable from Mr. Isaacson would meaningfully go to any factual

claim or legal element that Plaintiffs must establish, let alone constitute the *only* way of proving

any of them.  Because Mr. Isaacson's testimony would be *at most* cumulative, and more likely

irrelevant, Plaintiffs cannot satisfy the second factor.  *Marcos*, 1990 WL 74521, at *4; *Behar*,

779 F. Supp. at 275.

### 3.    The Information Sought is Obtainable from Other Sources.

Finally, Plaintiffs cannot demonstrate the testimony it seeks is unavailable from other

sources.  The federal reporter's privilege ensures that a journalist's First Amendment-protected

newsgathering activities and information are invaded "only as a last resort."  *Giuffre*, 221 F. Supp.

3d at 480 (citation omitted).  To achieve that objective, the party seeking disclosure must show

that it has "exhaust[ed] all other available sources" for the information sought before it can force

a reporter to reveal the information.  *In re Nat'l Broad. Co., Inc.*, 79 F.3d at 353.  Simply asserting

that such discovery would be burdensome is no justification.  *Persky*, 2002 WL 31769704, at *4.

---

[6] While Plaintiffs also seek to elicit testimony from Mr. Isaacson concerning their speculation that Mr. Musk was allegedly "in a precarious financial position after he agreed to buy Twitter" because of a "large decline in Tesla stock," (McNamara Decl. Ex E ¶ 153), this information (if true) is readily available from documents related to Musk's financial status.  And the law is clear that Plaintiffs' securities claim cannot possibly "rise or fall" on speculative motive and opportunity related testimony in place of Mr. Musk's knowledge of falsity, *i.e.*, scienter, that testimony could never be permitted.  *Zucco Partners, LLC*, 552 F.3d at 998.

For example, the Second Circuit has refused disclosure of a journalist's confidential newsgathering materials "despite the fact that '*hundreds of depositions*' had been taken and others might be necessary." *Id.* (emphasis added) (quoting *In re Petroleum Prods.*, 680 F.2d at 8-9, noting that Second Circuit "also suggested that the taking of 60 or 65 depositions may be a reasonable prerequisite to disclosure"); *see also In re Nat'l Broad. Co., Inc.*, 79 F.3d at 353 (quashing subpoena where party seeking discovery failed to attempt to obtain information from non-journalist sources).

Here, Plaintiffs have yet to depose Mr. Musk—in fact, they recently sought and obtained an extension to depose him *after* Mr. Isaacson's noticed deposition.  McNamara Decl. Ex. O.  On this basis alone, this Court should grant Petitioner's motion to quash.  *In re McCray, Richardson, Santana, Wise, & Salaam Litig.*, 928 F. Supp. 2d 748, 758 (S.D.N.Y. 2013) ("Court agrees with [reporter] that Defendants cannot show unavailability from other sources before deposing Plaintiffs"), *aff'd*, 991 F. Supp. 2d 464 (S.D.N.Y. 2013); *Marshall Project, Inc. v. City of Cleveland*, No. 24-MC-309 (VEC), 2024 WL 4589667, at *6-7 (S.D.N.Y. Oct. 28, 2024) (granting motion to quash where Defendants were engaged in discovery but had not deposed Plaintiff).

Even if Mr. Musk is deposed, Plaintiffs still cannot overcome the privilege because they have yet to exhaust all other available sources prior to impinging on Mr. Isaacson's First Amendment-protected activity.  As his declaration explains, the Book discloses all non-confidential sources chapter-by-chapter that Mr. Isaacson relied on for his newsgathering.  Isaacson Decl. ¶¶ 4, 6.  As to Chapter 78, Mr. Isaacson identifies a number of sources, including but not limited to, Jared Birchall and Alex Spiro, whom he interviewed.  *Id.* ¶ 6.  Yet, Plaintiffs' have apparently waived their ability to depose Mr. Birchall, Twitter, X Corp., and Quinn Emmanuel (Mr. Spiro's law firm) in the Action, and as such, waived their ability to inquire about

the Book from the primary, alternative sources with first-person knowledge of the information. McNamara Decl. Ex. K at 1C.  Plaintiffs cannot waive direct sources of information only to seek to fill those holes with privileged testimony from Mr. Isaacson.  *Pugh*, 1997 WL 669876, at *4 (finding Defendant had not overcome third prong where Defendant had "not deposed Plaintiffs' counsel or all of the individuals interviewed by 60 Minutes"); *In re Petroleum Prods.*, 680 F.2d at 9 (engaging in such a fact-finding "process . . . may also identify the actual purveyors of [the] information [at issue], thus obviating the need to inquire of [the journalists]").  And even if those alternative sources ultimately deny any statements made in the Book, Plaintiffs cannot conduct a "fishing expedition" and depose a journalist in the vain hope that he will contradict that testimony. *Giuffre*, 221 F. Supp. 3d at 477.

In sum, Plaintiffs have failed to satisfy each of the three required factors to overcome the qualified privilege for confidential information, and thus the Subpoena must be quashed.

**B.    To the Extent the Subpoena Calls for Testimony about Non-Confidential Newsgathering Materials, the Plaintiffs Still Cannot Satisfy their Burden of Overcoming the Reporter's Privilege.**

Even if this Court finds that Mr. Isaacson's contemplated testimony involves non-confidential newsgathering materials, or assuming *arguendo* that Plaintiffs' counsel could tailor the deposition to somehow avoid confidential sources entirely, Plaintiffs still cannot overcome the qualified test for obtaining such materials under the federal reporter's privilege, as the Subpoena necessarily seeks information concerning Mr. Isaacson's unpublished newsgathering processes. *See Appl. of Consumers Union of U.S., Inc.*, 495 F. Supp. 582, 586 (S.D.N.Y. 1980) ("Regardless whether [the subpoenaing party] seek[s] confidential sources, they seek to examine the reportorial and editorial processes.").

The courts of this Circuit have emphasized that the reporter's privilege extends to non-confidential unpublished materials because otherwise First Amendment protections would be

impermissibly burdened "if it were to become 'standard operating procedure for those litigating against an entity that had been the subject of press attention to sift through press files in search of information supporting their claims.'" *Giuffre*, 221 F. Supp. 3d at 477 (quoting *Gonzales*, 194 F.3d at 35). Those burdens include not only the "heavy costs of subpoena compliance" but also the symbolic and practical harms of "making journalists appear to be an investigative arm of the judicial system, the government, or private parties." *Id.*; *see also United States v. Shah*, No. 1:19-cr-833 (SHS), 2022 WL 1422252, at \*3 (S.D.N.Y. May 5, 2022) (chilling effect would result "because of the likelihood that [sources] would be sucked into litigation") (citation omitted).

To overcome the privilege for non-confidential newsgathering information, the applicant must "[1] show that the materials at issue are of likely relevance to a significant issue in the case, and [2] are not reasonably obtainable from other available sources." *Gonzales*, 194 F.3d at 36. Plaintiffs cannot satisfy either prong.

**1.    The Testimony Sought is Not of Likely Relevance to a Significant Issue in the Case.**

Courts frequently reject requests to obtain unpublished non-confidential information based on nothing more than "general claims that the [discovery is] likely to contain relevant material," and even a showing of a "particularized need" for the information sought will not suffice. *In re McCray*, 991 F. Supp. 2d at 470 (affirming magistrate's grant of motion to quash). Importantly, motions to quash are routinely granted where the testimony sought may be relevant to the defendant's credibility but not to a specific claim or defense. *Breaking Media, Inc. v. Jowers*, No. 21 Misc. 194 (KPF), 2021 WL 1299108, at \*4–5 (S.D.N.Y. Apr. 7, 2021) (granting motion to quash where newsgathering would be relevant to a party's motive but irrelevant to the misappropriation of trade secret or breach of contract claims).

Here, Plaintiffs cannot satisfy the relevancy requirement because, as explained *supra*, the testimony the Subpoena seeks is "merely duplicative or serv[es] a 'solely cumulative purpose.'" *Schoolcraft*, 2014 WL 1621480, at *3 (citation omitted).  The Plaintiffs' lawsuit against Mr. Musk is just about the three Statements at issue.  *Supra*, at 12–14; McNamara Decl. Ex. I at 39.  Thus, the only issues remotely relevant to the underlying action are whether those Statements made in May 2022 were materially misleading, made with scienter, and whether the alleged misrepresentations caused investors to suffer losses during the defined Class Period.  *Id.* at 1, 17.  Yet, as discussed *supra*, none of the legal elements Plaintiffs must prove for their securities claim remotely involve Mr. Isaacson's reporting, newsgathering, or his state of mind.  There is no nexus between the reporting and any *significant* issue in the case, and Plaintiffs are not permitted to go on a fishing expedition into Mr. Isaacson's newsgathering process simply because they have the vaguest inkling that something helpful for their legal claims might emerge.  *See In re McCray*, 991 F. Supp. 2d at 470 (quashing subpoena where the parties seeking disclosure simply made "general claims" that the information sought is "likely to contain relevant material").  That sort of "sifting" inquiry is precisely the type proscribed under the reporter's privilege.  *Gonzales*, 194 F.3d at 35; *see also Shah*, 2022 WL 1422252, at *4; *Sikelianos v. City of N.Y.*, No. 05-cv-7673(RJS)(JCF), 2008 WL 2465120, at *1 (S.D.N.Y. June 18, 2008).

## 2.     Plaintiffs Cannot Establish that the Information Sought is Not Reasonably Obtainable from Other Available Sources.

Even with non-confidential newsgathering information, courts still require a significant degree of "[e]xhaustion of all other available sources of information."  *New England Teamsters & Trucking Indus. Pension Fund v. New York Times Co.*, No. 1:14-mc-59, 2014 WL 1567297, at *3-4 (S.D.N.Y. Apr. 17, 2014) (collecting cases); *see also In re McCray*, 991 F. Supp. 2d at 470 ("Courts in the Second Circuit have quashed subpoenas when similar information could be obtained

elsewhere."); *Lebowitz v. City of N.Y.*, 948 F. Supp. 2d 392, 395 (S.D.N.Y. 2013) (exhaustion requirement not met where "at least three other witnesses identified by the plaintiff in discovery may have observed the events in question"). Exhaustion is shown when testimony from alternative witnesses is impossible, not merely difficult. For example, materials are "reasonably unobtainable . . . when the only other party who knows the information cannot be deposed." *In re McCray*, 991 F. Supp. 2d at 471 (discussing *United Sates v. Treacy*, 639 F.3d 32, 43 (2d Cir. 2011), finding that "the reporter was the only potential witness because the criminal Defendant possessed an absolute Fifth Amendment right not to testify"); *New England Teamsters*, 2014 WL 1567297, at *5 ("[m]ere belief that an alternative source is unwilling to provide the information, without more, cannot compel a finding that information is not reasonably obtainable.").

Plaintiffs cannot satisfy this exhaustion requirement. Even if they have sought or attempted to seek this information from *some* avenues, they must pursue *all* other possible sources of information, including from the named Defendant, Mr. Musk and other identified witnesses. *In re McCray*, 991 F. Supp. 2d at 471 ("[T]here is no case law supporting Defendants' allegation that information is not 'reasonably obtained elsewhere' when Plaintiffs in the case are available for deposition"). Plaintiffs are hardly in a position to argue they have pursued all alternative sources when they elected to waive the ability to depose plainly relevant individuals. Mr. Isaacson is not Plaintiffs' investigative tool. *See Marcos*, 1990 WL 74521, at *2 ("Many doors will be closed to reporters who are viewed as investigative resources of litigants. The hindrance to the free flow of information which accompanies this perception is inimical to the First Amendment.").

## **CONCLUSION**

For the foregoing reasons, this Court should quash the Subpoena issued to Mr. Isaacson.

Dated: March 25, 2025
New York, New York

Respectfully submitted,

/s/ *Elizabeth A. McNamara*
Elizabeth A. McNamara
Lindsey B. Cherner
DAVIS WRIGHT TREMAINE LLP
1251 Avenue of the Americas, 21st Floor
New York, New York 10020
Telephone: (212) 603-6437
lizmcnamara@dwt.com
lindseycherner@dwt.com

*Attorneys for Petitioner Walter Isaacson*

## <u>CERTIFICATE OF COMPLIANCE WITH WORD COUNT</u>

I hereby certify that the word count of this memorandum of law complies with the word limits of Local Civil Rule 7.1(c). According to the word-processing system used to prepare this memorandum of law, the total word count for all printed text exclusive of the material omitted under Local Civil Rule 7.1(c) is 7,143 words.  I certify under penalty of perjury that the foregoing is true and correct.

*/s/ Elizabeth A. McNamara*
Elizabeth A. McNamara
